FRANK B. DOLE & others *vs.* JOHN WOOLDREDGE
& another.

Suffolk. March 25. — June 30, 1886. W. ALLEN & HOLMES, JJ.,
absent.

A bill in equity against A. was inserted in a writ dated April 20, 1882. Issue was
joined on October 2, 1883. In December, 1883, A. had the case set down for a
hearing upon the merits, and insisted upon a hearing unless certain attachments
of real estate made upon the writ should be postponed to certain conveyances
which he wished to make. An agreement to this effect was made, and the hear-
ing was postponed. On February 21, 1884, the plaintiff filed an amended bill,
joining B. with A. as a party defendant. This bill charged no new matter of
substance against A. On September 23, 1884, A. filed an application that issues
of fact be framed, and that the same be tried by a jury. Process was not served
upon B., and he did not appear as a party. On September 25, 1884, A. filed an
answer to the amended bill, which differed from his answer to the original bill
only in demanding a jury trial. Issue was joined on the amended bill and
answer on November 21, 1884. *Held*, that A., by setting down the case for a
hearing in December, 1883, had waived a right to a trial by jury ; and that the
subsequent amendment did not avoid the effect of the waiver. *Held, also*, that
the judge, to whom the application to have issues framed for the jury was
made, did not, in the exercise of his judicial discretion, err in refusing to allow
them to be framed.

At the hearing of a suit in equity against A. and B. for conspiring to defraud the
plaintiff, no exception lies to the admission in evidence, in behalf of the plaintiff,
of declarations of B. relating to the conspiracy, if there is then evidence in the
case of the existence of the conspiracy, and the plaintiff offers to produce further
evidence, although B. has not been served with process, and has not appeared as
a party defendant.

The giving in evidence by one party of part of a conversation entitles the other
party to introduce so much of the rest of it as relates to the same subject.

The plaintiff filed interrogatories to a witness, whose deposition was to be taken on
a commission. The defendant objected to each and every interrogatory for
form and substance, and waived the filing of cross-interrogatories. The plain-
tiff then filed additional interrogatories, to which the defendant made the same
objections, and also waived the filing of cross-interrogatories. The additional
interrogatories were not answered. *Held*, that this fact did not entitle the
defendant to have the deposition excluded.

A bill in equity against A. and B. alleged that B., the owner of a mine, conspired
with A. to call the price of the mine $200,000, and, in pursuance of such con-
spiracy, A. and B. made certain representations to the plaintiff, whereby he and
A. agreed to buy the mine at that price, organize a corporation to work the
mine, and transfer the mine to the corporation, the stock to be distributed
between the plaintiff and A. in proportion to their interests in the mine ; that in
fact B. was willing to sell the mine for $100,000, and received only this amount,
the plaintiff paying for his interest at the rate of $200,000, and A. receiving the
difference. *Held*, that the bill did not allege such a scheme to defraud the pub-
lic as to prevent the plaintiff from maintaining the bill against A.

BILL IN EQUITY, inserted in a writ dated April 20, 1882, brought originally by Frank B. Dole, James P. Cook, Benjamin O. Cutter, and Charles A. Sinclair, against John Wooldredge alone, and containing the following allegations:

1. On or about July 15, 1878, the said Wooldredge introduced to said James P. Cook the subject of the purchase of a mine in Placerville in the State of California, known as the Prospect Flat mine, and spoke to him about said purchase from time to time, and from time to time read to him extracts from letters purporting to be written to said Wooldredge by one J. H. Purkett, the agent of the owner of said mine, describing said mine and setting forth its great value, and stating that it could be purchased of its owner, one Horatio L. Robinson, who then was and now is an inhabitant of said Placerville, for the sum of one hundred and twenty-five thousand dollars. During the fall of the year 1879 said Wooldredge again spoke to said Cook about said mine, and told him that it had largely increased in value, and that he, said Wooldredge, had received a letter from said Purkett stating that said Robinson had sold a part of said mine and now asked the price of two hundred thousand dollars for the remaining portion, whereas the whole of said property might have been purchased before for one hundred and twenty-five thousand dollars. He further represented to said Cook, that said mine was turning out well, and that it was too bad to lose the chance of purchasing the remainder of said mine at the price of two hundred thousand dollars, and urged the said Cook to join him in the purchase of said mine at that price, and proposed to send out an expert to examine said mine and report upon its condition and value.

2. Subsequently, and in consequence of these representations, and at the request of said Wooldredge, the said Cook introduced said Wooldredge to the said Dole and the said Sinclair, and the said Wooldredge had several conversations with them and with said Cutter in regard to said mine, and said Wooldredge read to them letters from said Purkett and others in reference thereto, and it was finally agreed between the plaintiffs and the said Wooldredge that said Cutter, who was engaged in the mining business, should, with said Dole and Wooldredge, visit and examine said mine, and that in case they should think

favorably of the same, they, with the said Wooldredge, would buy said mine, or such portion as remained in said Robinson's hands, at the lowest price at which it could be bought, but that the sum of two hundred thousand dollars might be paid therefor, provided it could not be bought at a lower price; and that thereupon a corporation should be organized to work said mine, and that the same should be transferred to such corporation, and that the stock of such corporation should be distributed to the plaintiffs and to said Wooldredge in proportion to their shares or interests in said mine. And it was further agreed, that the parties in interest should pay for and hold said mine and the stock of said proposed corporation in the following proportions: John Wooldredge, four sixteenths; James P. Cook, three sixteenths; Charles A. Sinclair, three sixteenths; Frank B. Dole, three sixteenths; Benjamin O. Cutter, three sixteenths.

3. In consequence and in pursuance of said agreement, said Wooldredge, Dole, and Cutter, on or about February 16, 1880, proceeded to Placerville aforesaid; [and said Cutter having examined said mine and being of opinion that it was a valuable one,] said mine was purchased from said Robinson for the alleged sum of two hundred thousand dollars, he to allow the purchasers five thousand dollars out of said sum for their expenses; and a deed of said mine was executed by said Robinson, upon March 1, 1880, to said Wooldredge and Dole, for the benefit of the parties interested as above. And subsequently, and in pursuance of the agreement among all the parties in interest, a corporation was organized, called the Lyon Gravel Gold Mining Company, to which a portion of said mine was conveyed and transferred, and the shares were allotted to said Wooldredge, Cook, Dole, Sinclair, and Cutter, in the proportions above set forth : said Wooldredge four sixteenths, and the said Cook, Dole, Sinclair, and Cutter, three sixteenths each. And subsequently another corporation was formed, called the Kum Fa Gold Mining Company, to which the remaining portion of said mine was conveyed, and shares were allotted to the stockholders of the Lyon Gravel Gold Mining Company in proportion to their respective interests therein.

4. Said Wooldredge, in all his conversations with the plaintiffs, or with either of them, always represented to them that the

price of said mine was two hundred thousand dollars, and that it could not be purchased for any less sum; and the said Wooldredge stated further to the said Cutter and to the said Dole, that he paid to the said Robinson his full proportion of money, and that he had sold securities in San Francisco to procure the necessary funds, and, in order to get a deed, promptly advanced for the plaintiffs the sum of forty-eight thousand seven hundred and fifty dollars, which the plaintiffs afterwards paid him in Boston, with interest; and the said Robinson, in conversation with said Dole and said Cutter, always stated that two hundred thousand dollars was the price, and the lowest price, for which the said mine could be purchased. All the negotiations with said Robinson were carried on by said Wooldredge as the partner and agent of the plaintiffs, and the sale was finally arranged and completed by him. Said sale being determined upon, the plaintiffs paid their proportion of said two hundred thousand dollars, less five thousand dollars allowed for expenses, as follows: to wit, ninety-seven thousand five hundred dollars were paid by them directly to said Robinson through his agent, the said J. H. Purkett, and forty-eight thousand seven hundred and fifty dollars, with interest thereon, were paid by them to said Wooldredge to reimburse him for that amount which he claimed to have paid to said Robinson in cash on their account, as above set forth. And the plaintiffs were informed and assured by the said Wooldredge that he had not only advanced the said sum of forty-eight thousand seven hundred and fifty dollars on their account, but that he had duly paid his share, amounting to forty-eight thousand seven hundred and fifty dollars, making, as he alleged, in all the sum of one hundred and ninety-five thousand dollars.

5. The statements of the said Wooldredge and of the said Robinson as to the price of the said mine, and as to the amount paid to said Robinson therefor, were wholly false; and the said Wooldredge, conspiring and arranging with the said Robinson to cheat and defraud the plaintiffs, agreed with said Robinson that they should call such price two hundred thousand dollars, and that the statements made to the plaintiffs by said Robinson as above set forth were made in pursuance of such arrangement and conspiracy; the price of said mine was a very much less

sum than the price named, [and said Wooldredge paid, and said Robinson received, a very much less sum, the precise amount of which the plaintiffs are unable to state, but which, according to their information and belief, was not over one hundred thousand dollars; and the difference between said sum and the sum of two hundred thousand dollars, alleged to have been paid, was and is now fraudulently retained by the said Wooldredge in his hands.]

6. The fact of said fraudulent conspiracy and agreement, and the fact that the price paid to said Robinson was not said sum of two hundred thousand dollars, but was a very much less sum, as is hereinbefore set forth, was fraudulently concealed from the plaintiffs, and they have only discovered the same within a very short time; and upon the discovery of said fraud, and of the facts herein set forth, they demanded of said Wooldredge that he should reimburse to them the money so fraudulently received, which he has wholly declined and refused to do.

The prayer of the bill was that said Wooldredge be required to disclose and state the amount actually paid for said mine, and be decreed to pay over to the plaintiffs the sum fraudulently obtained and withheld by him, in proportion to their interest in said mine when purchased; and for further relief.

The answer, filed June 22, 1883, denied that the defendant made any false statements or representations to the plaintiffs, or either of them, relative to said mine or the price of the same; that he conspired and arranged with said Robinson to cheat and defraud the plaintiffs as is alleged in said bill, or in any manner whatever; and that he at any time received, or now has in his hands, any moneys to which the plaintiffs are in any way entitled.

It appeared from the record that issue was joined on October 2, 1883.

On February 21, 1884, the plaintiffs filed an amended bill, which was allowed the same day, making Robinson a party, and containing the same allegations as in the original bill, with these exceptions and additions:

In paragraph 3 of the original bill, the words now enclosed in brackets were omitted in the amendment, and the following were inserted in place of them: " that said Cutter examined said mine and was of opinion that it was a valuable one. And

your orators say that the said respondents had theretofore formed a conspiracy to defraud your orators in the purchase of said mine, and that the doings of said Wooldredge hereinbefore set forth were in pursuance of said conspiracy, and that after the examination of said mine by said Cutter, and in pursuance of said conspiracy, negotiations were resumed by said Wooldredge, acting as partner and agent of your orators, and well known by said Robinson to be acting in that capacity; that"

In paragraph 5 of the original bill, the words now enclosed in brackets were omitted in the amendment, and the following were inserted in place of them: " said Wooldredge paid nothing to said Robinson, and if he paid anything to said Robinson the amount thereof has since been returned to said Wooldredge, or is held by said Robinson for the benefit of said Wooldredge; said Wooldredge paid and said Robinson received for said mine a sum very much less than two hundred thousand dollars, to wit, the sum of ninety-five thousand dollars, and said Robinson has either paid over to said Wooldredge, or holds for his benefit, all sums of money paid to said Robinson in excess of said purchase money, to wit, ninety-five thousand dollars. It was agreed between said Wooldredge and the plaintiffs, as hereinbefore set forth, and with the knowledge of said Robinson, that your orators should pay three fourths of the purchase money of said mine, and in consequence thereof the proportion which the plaintiffs were bound to pay was three fourths of the amount received by said Robinson, to wit, three fourths of ninety-five thousand dollars, and said Wooldredge and said Robinson, and each of them, in pursuance of said conspiracy and as a result thereof, have received and now fraudulently withhold from the plaintiffs a large sum of money, to wit, the difference between three fourths of the amount of purchase money received by said Robinson and the entire amount of money paid by the plaintiffs to said Robinson and said Wooldredge, or either of them, as hereinbefore set forth, to wit, seventy-five thousand dollars and interest."

The prayer of the amended bill added the name of Robinson.

On September 23, 1884, the defendant Wooldredge filed an application that issues of fact be framed, and that the same be tried and determined by a jury.

On September 25, 1884, Wooldredge filed an answer to the amended bill, which was in the same words as the answer to the original bill, except in referring to the bill as the " amended bill," and with this addition : " And this defendant demands a trial by jury upon all material issues of fact essential to the determination of this suit."

The record stated that issue was joined on November 21, 1884.

On September 30, 1884, Wooldredge filed a paper suggesting the following as proper issues to be framed for a jury, and demanded a jury trial :

" 1. Did the said Wooldredge and Robinson, prior to February 16, 1880, form a conspiracy to cheat and defraud the complainants in the purchase of said mine, as alleged in said amended bill ?

" 2. What was the actual price paid by the purchasers of said mine ?

" 3. In the purchase of said mine, did the defendant Wooldredge obtain any benefit, advantage, or profit over the other purchasers thereof, as alleged in said amended bill? "

On November 29, 1884, *Field*, J., overruled Wooldredge's motion that issues be framed, and filed the following memorandum :

" In addition to the facts that appear of record, I find that the defendant, in December, 1883, had the cause, upon the pleadings as they then stood, set down for a hearing upon the merits before a single justice of this court, and insisted upon a hearing unless some agreement could be made whereby the attachment of real property made under the writ should be postponed to certain conveyances which Mr. Wooldredge desired to make; that an agreement was ultimately made to this effect, and the defendant did not then insist upon the hearing. Before the application made by the defendant for issues to a jury, the plaintiffs had never moved the court for a hearing. On the facts appearing of record from the papers on file, and the facts not of record found by me, I was of opinion that the defendant was not entitled to issues to a jury as of right, and so ruled; and ruled that it was a matter of discretion to be exercised according to the practice of courts of equity. As a matter of discretion, I was not satisfied that the cause could be tried more intelligently by a jury than without a jury, and I overruled the motion that issues to a jury be framed."

Wooldredge appealed from the order overruling the motion that issues be framed, and also filed a bill of exceptions to the order, which embodied the judge's memorandum, as above set forth.

The case was then heard on the merits, before *W. Allen*, J., the evidence being taken before a commissioner; and the judge filed the following memorandum of his decision:

"1. The decisive question is whether the ostensible price, $195,000, was the price actually paid; if it was, the plaintiffs paid only their proportion; if the actual price was less, all that the plaintiffs paid over three fourths of it was for the benefit of the defendant, and was obtained by his fraud, in which Robinson participated.

"2. The burden of proving that the ostensible was not the real price is upon the plaintiffs; and upon this question the declarations of Robinson are not competent; nor are they to be received as contradicting or corroborating his testimony in his depositions.

"3. The statements of Robinson in his depositions are entitled to no weight except as corroborated.

"4. The evidence proved that the price paid was $100,000; that $97,500 was paid by the plaintiffs on or about March 1, 1880, and that the defendant paid nothing at that time and nothing subsequently, except $2500, with, perhaps, interest upon it; and that subsequently to March 1 the plaintiffs paid to the defendant $48,750, with interest from that date, to refund to him a payment which he represented that he had made at that time.

"5. There is not proof of any illegal purpose in the purchase such as will prevent the plaintiffs from recovering from the defendant the money obtained from them by his fraud.

"6. The plaintiffs are entitled to recover the $48,750, and so much of the $97,500 as exceeds $75,000 (which is three fourths of the price paid), being $22,500, both sums amounting to $71,250, with interest from March 1, 1880."

A decree was accordingly entered for the plaintiffs; and the defendant Wooldredge appealed to the full court.

Annexed to the record was a report of the testimony taken by the commissioner, in which appeared several exceptions to the admission of evidence. These appear in the opinion.

*F. A. Dearborn*, for Wooldredge. 1. The defendant was entitled to a jury trial, as of right.

Article 15 of the Declaration of Rights is as follows: "In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore been otherways used and practised, the parties have a right to a trial by jury; and this method of procedure shall be held sacred, unless, in causes arising on the high seas, and such as relate to mariners' wages, the Legislature shall hereafter find it necessary to alter it."

This suit is undoubtedly a controversy concerning property, as well as a suit between two or more persons. Unless it is within the exception, the defendant is clearly entitled to demand a jury trial at some stage of the proceedings.

"The whole difficulty as to the first part of the inquiry (in which cases parties have a constitutional right to demand a jury) would seem to lie in settling the historical question, as to what cases were and what were not tried by jury before the adoption of the Constitution." Aldr. Eq. Pl. 161. *Powers* v. *Raymond*, 137 Mass. 483. This test for cases, where the constitutional right does or does not exist, is applied in other States. *Wheelock* v. *Lee*, 74 N. Y. 495. *Whitehurst* v. *Coleen*, 53 Ill. 247. *Mead* v. *Walker*, 17 Wis. 189. *Thomas* v. *Bibb*, 44 Ala. 721. *Mathews* v. *Tripp*, 12 R. I. 256. *North Pennsylvania Coal Co.* v. *Snowden*, 42 Penn. St. 488. The framers of the colonial charters were little disposed to establish a system of equity. In New England and Pennsylvania there was no such system, and only slowly and jealously were equity powers conferred upon the courts to soften the unyielding spirit of the law in such cases as mortgages, penalties, and trusts. 7 Dane Abr. 518, 519.

The defendant in an equity suit has a constitutional right to a trial by jury, especially where the remedy sought is legal in its nature. *Franklin* v. *Greene*, 2 Allen, 519, 522. *Stockbridge Iron Co.* v. *Hudson Iron Co.* 102 Mass. 45. *Powers* v. *Raymond*, *ubi supra.*

In *Charles River Bridge* v. *Warren Bridge*, 6 Pick. 376, 399, a bill to enjoin a nuisance, brought under the St. of 1827, *c.* 88, Parker, C. J., said: "Whenever a party in a suit in equity shall require that any controverted fact be tried by a jury, the

court, by force of the article above mentioned [Art. 15], will be obliged to order an issue for that purpose, and thus the constitutional security is preserved."

In *Franklin* v. *Greene, ubi supra*, an equity suit to restrain a foreclosure, and recover notes alleged to have been obtained by fraud, Chapman, J., said: "In this Commonwealth the right of trial by jury is secured by the Constitution."

Our courts have gone no further in restricting the right, than to decide that a plaintiff, having voluntarily chosen an equity tribunal, cannot claim a jury as a matter of right. *Ross* v. *New England Ins. Co.* 120 Mass. 113. This case clearly recognizes a defendant's right to a jury.

The defendant's right to a jury, under the Constitution, is clearly recognized in other States. Thus, in New York, where chancery powers existed at the time of the adoption of its constitution, it is nevertheless held that the joinder of an equitable cause of action with others purely legal does not deprive the defendant of his right to a trial by jury. *Wheelock* v. *Lee, ubi supra. Bradley* v. *Aldrich*, 40 N. Y. 504. *Hudson* v. *Caryl*, 44 N. Y. 553.

If this rule shall be followed, can there be any doubt that an action would lie at common law in favor of these plaintiffs to recover the $48,750, which the opinion finds the defendant represented he had paid to Robinson for them in the purchase of Robinson's quarter? If so, has not the defendant a right to demand a jury at least on that part of the case? *Marston* v. *Brackett*, 9 N. H. 336, 349. *Hoitt* v. *Burleigh*, 18 N. H. 389. *Stillwell* v. *Kellogg*, 14 Wis. 461.

The exception in Article 15 of the Declaration of Rights, "except in cases in which it has heretofore been otherways used and practised," relates to the local use, law, and practice in this State at the time of the adoption of the Constitution. *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 344, 368.

This differs materially from the provisions of some other constitutions, as, for example, that of Vermont, which contains the more general declarations that trial by jury "ought to be held sacred" upon "any issue in fact proper for the cognizance of a jury," which was held to relate to the future, as well as the past, in *Plimpton* v. *Somerset*, 33 Vt. 283, 291.

So under a constitution which declares directly, and not in the form of an exception, that trial by jury shall continue "as heretofore, and the right thereof remain inviolate," it is held that the Legislature cannot give a court of equity, acting without a jury, power to determine legal rights, unless there is some equitable ground of relief. *Haines's appeal*, 73 Penn. St. 169. *North Pennsylvania Coal Co.* v. *Snowden, ubi supra.* And it is also held that trial by jury may be withheld from new tribunals created by statute, and not clothed with common law powers, " because 'heretofore,' that is, at the common law, which antedated our constitutions, trial by jury did not exist in such cases." *Rhines* v. *Clark*, 51 Penn. St. 96, 101. *Haines* v. *Levin*, 51 Penn. St. 412.

The Constitution of Georgia, of 1798, which provides (art. 4, § 5) that "trial by jury, as heretofore used in this State, shall remain inviolate," was adopted ten years after the similar article in Massachusetts. Probably the latter article was in the minds of the framers of the former, and "heretofore used in this State" was doubtless intended to have the same meaning as the Massachusetts provision, the framers of all the constitutions of the original States aiming to establish like commonwealths. *Harper* v. *Elberton*, 23 Ga. 566.

In *Hargraves* v. *Lewis*, 3 Kelly (Ga.) 162, 168, it is said: "It was at one time a question in Georgia, whether a jury was at all necessary in trials in equity. That is to say, whether the act of 1799, conferring chancery powers on the superior courts, did not clothe the judge with the powers of a chancellor in England. I advert to this not for the purpose of discussing the question, but of saying that such a doubt no longer exists; that the usage of the superior courts for a long series of years has been to submit the facts in all trials in equity to a jury, and that this usage has been sanctioned by repeated acts of the legislature recognizing it. I have no doubt but that it had its origin in quite sufficient authority of law. In Georgia the judge and the jury constitute the chancellor."

Church, C. J., in *People* v. *Justices*, 74 N. Y. 406, gives to the constitutional provision in New York, that the "trial by jury in all cases in which it has been heretofore used shall remain inviolate forever," direct application to the previous use, practice, and

condition of things in that State thus: " This means a common law jury of twelve men. Courts of special sessions have existed since 1744, and have been continued both under the colonial and state government to the present time. No jury was permitted in these courts until 1824. . . . . A trial by such a jury was not used at the time of the adoption of the present Constitution in trials by courts of special sessions for the offence charged against the relator in this case."

So in Massachusetts, the above provision has been repeatedly construed with reference to the usage as to juries here, and not elsewhere. Thus, in *Shirley* v. *Lunenburg*, 11 Mass. 379, 385, relating to the removal of a pauper, Parker, C. J., said: "This case comes within the exception to that general provision of causes which were used and practised otherways before the adoption of the Constitution. For, from the settlement of the country, all questions relative to the settlement or removal of paupers were heard and determined by the Courts of General Sessions of the Peace, without the intervention of a jury." So, probate causes are within this exception, because locally the use and practice here did not authorize a jury in such cases. " Before the adoption of the Constitution, and for some time after, all appeals from judges of probate were heard and determined by the Governor and Council, without a jury." Gray, C. J., in *Davis* v. *Davis*, 123 Mass. 590, 593.

Cases of divorce and alimony fall within the exception, for the reason that jurisdiction in them was vested in the Governor and Council until transferred to this court by the St. of 1785, c. 69, and a trial by jury was never had in them until allowed on libels for divorce by the St. of 1855, c. 56. *Bigelow* v. *Bigelow*, 120 Mass. 320

So, a complaint to collect a fine under the militia law, was a case in which a jury was not " heretofore used " in Massachusetts. *Mountfort* v. *Hall*, 1 Mass. 443, 455, 457.

" Whether the framers of the Constitution, and the people, had reference to those former chancery tribunals, when they adopted the exception to the general provision in the 15th article, may admit of question; we are inclined to think, however, that the word ' heretofore ' in the exception could hardly be applicable to a practice which had ceased to exist nearly a

century before the Constitution was adopted." Per Parker, C. J.,
in *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 368.

A constitution, like a statute, is held to have been prepared
and adopted in reference to the local laws and events then exist-
ing, and the evils to be remedied in the locality where it is to
take effect. It does not relate to substantially new proceedings,
and rights arising after the adoption of the constitution. *Com-
missioners* v. *Morrison*, 22 Minn. 178. *People* v. *Potter*, 47 N. Y.
375. *People* v. *Fancher*, 50 N. Y. 288. *Whitehurst* v. *Coleen*,
*ubi supra. Trigally* v. *Memphis*, 6 Cold. 382. *Kennedy* v. *Gies*,
25 Mich. 83. *Sims's case*, 7 Cush. 285, 295.

It thus seems clear that the exception in the Declaration of
Rights, Art. 15, must relate to the common law and usages ex-
isting in this State at the time of its adoption, and not to
the English law or practice. The common law of England
did not itself include the older English statutes, some of which
form a part of our common law, and the English common law
came into " use and practice " here only so far as it was
applicable to our condition. 1 Kent Com. 472, 473. *Elder*
v. *Burrus*, 6 Humph. 358, 366. *McManus* v. *Carmichael*, 3
Iowa, 1.

So to our common law are further added local tradition, and
ancient usages which apparently originated in laws enacted
by the Legislature of Massachusetts Bay, and which were
annulled by the repeal of the first charter. *Commonwealth* v.
*Knowlton*, 2 Mass. 530, 534. *Commonwealth* v. *Churchill*, 2 Met.
118, 123.

The chancery powers exercised by the courts of Massachusetts
in existence at the time of the adoption of the Constitution
(1780) were very limited, extending only to granting relief in
cases of mortgages and penal bonds. Aldr. Eq. Pl. 2. *Harvard
College* v. *Theological Society*, 3 Gray, 280, 282.

There was no equity jurisdiction for discovery until the St.
of 1818, *c.* 122 ; nor in partnership transactions, until the St. of
1823, *c.* 140 ; nor in cases of fraud, until the St. of 1855, *c.* 194,
nor in cases where there is not a plain, adequate, and complete
remedy at law, until the St. of 1857, *c.* 214.

The equity powers gradually given to the court were exer-
·ised cautiously and with strict reference to the class of cases

named in the statutes. *Harvard College* v. *Theological Society, ubi supra. Dwight* v. *Pomeroy,* 17 Mass. 303, 327. *Charles River Bridge* v. *Warren Bridge,* 6 Pick. 395, and 7 Pick. 370.

This court has decided that the case at bar is cognizable at equity, if at all, solely on the grounds that it may be a partnership transaction, or that the remedy at law is not so plain as in equity, neither of which constituted a ground for equitable jurisdiction at the time of the adoption of the Constitution. *Dole* v. *Wooldredge,* 135 Mass. 140.

The exception of cases which have "heretofore been otherways used and practised," refers to cases used and practised in Massachusetts, and not used and practised generally in England and other States. The latter construction would deny to the defendant his right of jury trial in almost every case. The widest diversity of practice prevailed among the States as to trial by jury when our Constitution was adopted.

In consequence of this diversity among the States, and the impracticability of arriving at a common understanding, the Federal Constitution was silent as to trial by jury in civil cases. This silence gave great offence, especially in Massachusetts, where it was proposed to insert a provision for trial by jury, with an exception in the language of our own Constitution. The opposers of the proposed provision showed that such an excepting clause for a Federal Constitution would deny trial by jury in almost every case, so much diversity on the subject prevailed in the States. Debates in Mass. Convention of 1788, 216.

It can scarcely be supposed that the founders of the Massachusetts Constitution intended to make so radical a change in their legal procedure as to deprive a party of a jury trial, if it should appear that, although trial by jury had in a particular case been used and practised in Massachusetts, a contrary practice prevailed in some other State. Yet such would be the logical deduction if the wide construction of the excepting clause now objected to shall be held the true one.

It is also worthy of notice, as showing the desire of our ancestors to preserve trial by jury, that the first draft of the Massachusetts Constitution omitted entirely the excepting clause, which was afterwards added by the committee. Journal of Convention (1779–80), 152.

If "heretofore used and practised" meant used and practised anywhere, or even generally, the power given in Article 15 to the Legislature to dispense with a jury, if it saw fit, in cases arising on the high seas and relating to mariners' wages, was superfluous. Admiralty powers already existed in England and in other States.

Since trial by jury was the rule, and trial without jury the exception, the plaintiffs must satisfy the court that the case at bar is such a case as it was the usage and practice to try without a jury when the Constitution was adopted. If the question is left in doubt, that doubt must be resolved in the defendant's favor. The plaintiffs cannot bring themselves within the exception by showing that in Massachusetts, at the time of the adoption of the Constitution, the case at bar could have been tried neither at law nor equity, since, if not triable at all, it cannot be said that the practice and use were to try without a jury. If a remedy at law existed, a jury trial must be granted, though the mode of obtaining that remedy be arduous, as by a multiplicity of suits, or not so plain as in equity. The plaintiffs' convenience cannot take away the defendant's constitutional right.

2. The defendant has not waived his right to a trial by jury. Setting a case down for a hearing does not amount to a waiver, unless a trial is entered into. No Massachusetts case has gone further than to say that submitting to trial without demanding a jury was a waiver of the right. See *Shaw* v. *Norfolk County Railroad*, 16 Gray, 407; *Atlanta Mills* v. *Mason*, 120 Mass. 244; *Parker* v. *Nickerson*, 137 Mass. 487; *Pomeroy* v. *Winship*, 12 Mass. 513, 524; *Elliott* v. *Balcom*, 11 Gray, 286.

"Whenever a party is concluded by his own act, and held to have waived any right or privilege, such act should not be left doubtful, but should plainly and explicitly appear. Every reasonable presumption should be made against the waiver, especially when it relates to a right or privilege deemed so valuable as to be secured by the Constitution." *United States* v. *Rathbone*, 2 Paine C. C. 578. This case held that the defendant had not waived his right to a jury by agreeing on the record to a certain referee, when the order of reference had been made against his objection.

In *People* v. *Albany & Susquehanna Railroad*, 57 N. Y. 161, the defendant did not claim a jury until the plaintiff had read his pleadings and opened his case. It was held no waiver. Johnson, C., said: "I find nothing which, as authority, stands in the way of settling this question upon reasonable grounds, and cannot consent to hold that a party may be deemed precluded by acquiescence who claims his right to a jury trial before a witness has been sworn or examined. A party cannot be deprived of this, his constitutional privilege, by a mere technicality."

*Wheelock* v. *Lee, ubi supra*, was a case in which legal and equitable causes of action were joined; and it was held that the defendant had not waived his right to a jury " by consenting that the case be placed on the calendar for trial at the special term, and by noticing the case for trial at that term." See also *Colman* v. *Dixon*, 50 N. Y. 572.

The Louisiana Code of Practice provides that " the defendant, who wishes for a trial by jury, must pray for it in his answer, or previous to the suit being set down for trial." In *Louisiana State Bank* v. *Duplessis*, 2 La. An. 651, it was held that, where the case had been several times set down for trial and continued, and it did not appear that at the time of asking for a jury it was so set down, the defendant had not waived his right to claim a jury. This case was cited and followed in *Gallagher* v. *Hebrew Congregation*, 34 La. An. 526, which was an action to subject the defendant's property to the plaintiff's judgment lien, and, before the defendant's claim for a jury, had been assigned for trial six times.

The Tennessee Code requires the chancellor to empanel a jury to determine issues of fact on the application of either party. A suit in chancery to settle and wind up a partnership was brought in May, 1873; an amended bill was filed in December, 1873, and answered in February, 1874; a second amended bill was filed in April, 1874, and answered in July, 1874. Testimony was taken, down to September, 1876. In April, 1877, the cause was ready for a hearing, and on April 18th was in order for trial by the court. Before the calling of the docket, the plaintiff demanded a jury, and was refused, and the case was heard by the court. The higher court held that a jury should have been granted, and that the demand might be made at any time before

the case was, in fact, heard, and a new trial was granted. *Allen* v. *Saulpaw*, 6 Lea (Tenn.) 477. See also *Benbow* v. *Robbins*, 72 N. C. 422; *Hinchly* v. *Machine*, 3 Green (N. J.) 476.

Can the court say, in the light of these decisions, that the defendant's act in "setting down the case for a hearing upon the merits before a single justice of this court, and insisting upon a hearing unless some agreement could be made whereby the attachment of real property made under the writ should be postponed to certain conveyances which the defendant desired to make," showed a plain and explicit intention to waive his constitutional right?

3. The defendant, by claiming a jury in his answer to the amended bill, is reinstated in any rights he may have waived. It is well settled that, if an amendment makes a material change in the bill, the defendant has a right to a new defence. The situation of the defendant was changed by the amendment. Before the amendment making Robinson a party, his testimony could be obtained only by deposition, or by his voluntary appearance as a witness. A deposition of a witness living in California and constantly travelling, might be difficult for the plaintiffs to take; whereas, if Robinson should voluntarily submit himself to the jurisdiction of the court, — an act over which the defendant Wooldredge had no control, — his testimony could be readily taken by interrogatories. With this contingency in view, the defendant might well say that he desired such testimony to be presented to a jury.

4. This court, in its discretion, should grant a trial by jury of the disputed facts necessary for the determination of the suit.

Very many cases are found in the reports in which the court has, in the exercise of its discretion, framed issues for a jury after the filing of a master's report, and even after a refusal of a request for a jury, a hearing on the merits, and an appeal to the full court. *Pomeroy* v. *Winship, ubi supra*, where a deed relied on by one party was sought to be impeached as fraudulent by the other. *Crittenden* v. *Field*, 8 Gray, 621, a suit to restrain the obstruction of a mill privilege. *Franklin* v. *Greene, ubi supra*, a bill for an injunction, and to recover mortgage notes. *Stockbridge Iron Co.* v. *Hudson Iron Co., ubi supra*, a bill to reform a contract. *Atlanta Mills* v. *Mason, ubi supra*,

a bill to restrain the defendant from flowing the plaintiff's land by a dam. *Ross* v. *New England Ins. Co., ubi supra,* a bill to reform an insurance policy. *Harris* v. *Mackintosh,* 133 Mass. 228, a bill to enjoin the exercise of an offensive trade.

Such questions as arose in this case are tried every day by juries in common law courts. Would it be held a proper exercise of judicial discretion in a judge of the Superior Court, to withhold from the jury, had he the power, such questions whenever they arose?

The position of the defendant, in asking for a jury, was one of much merit. If it be held that he had waived his right to a jury, it was only by the technical operation of a rule which has never been stated by the court, and which he was not morally bound to know, if he were legally; and weight ought to be given to the request of a party, even where the court would not, of its own motion, have framed issues. In marking the cause for a hearing, he was compelled to this action to relieve himself from the immediate burden of the plaintiffs' attachments, and when an arrangement was made in this matter, he, in deference to the wishes of the plaintiffs, forbore to press the hearing, thus, as he supposed, restoring matters to their former condition.

The amendment to the bill was filed afterwards, and was immediately followed by the answer, in which was the claim of a jury. Certainly the defendant cannot be charged with laches in point of time.

On these considerations, it is submitted that the judge below erred in refusing the motion for a jury, and this error should now be rectified by the court. In the words of Staples, J., in *Williams* v. *Blakey,* 76 Va. 254: "As a general rule, where the credit and accuracy of the witnesses are impeached, or where the evidence is clashing and conflicting, rendering it necessary to weigh the character and credibility of the witnesses, or where the evidence is so equally balanced on both sides that it becomes doubtful which scale preponderates, an issue ought properly to be directed."

[The argument on the other points is omitted.]

*N. Morse & S. Lincoln,* for the plaintiffs.

C. ALLEN, J. The defendant's counsel has made an excellent argument in this case, which has received our full consideration;

but we have come to the conclusion that the decision of the justice before whom the case was heard must stand.

Assuming, without deciding, that the defendant might have insisted upon a trial by jury as a matter of constitutional right, if his demand therefor had been seasonably made, we are of opinion that he waived this right. That such right may be waived is clear. *Parker* v. *Nickerson*, 137 Mass. 487, 492. The cause was at issue on October 2, 1883, and under the 28th Chancery Rule then in force, (new rules, No. 27,) it was to be considered as ready for a hearing one month later. By the rules prescribing the order of business in Suffolk County, a weekly list of matters to be heard in equity before a single justice was made up for Tuesday of each week, on which cases might be set down, either by motion to the justice at his first coming in on any previous day, or by agreement of counsel and notice to the clerk of the court. These rules were made in pursuance of the provision of the Gen. Sts. *c.* 113, § 26, (Pub. Sts. *c.* 151, § 33,) allowing the court to make rules regulating the practice and proceedings of the court in matters of equity, so as to discourage delays and expedite the decision of causes. The cause being thus ready for a hearing, two courses were open to either party wishing to move in the matter. One was to proceed in the usual manner in equity causes, and apply for a hearing before a single justice, unless it was desired to send the case to a master. The other course was, under the Pub. Sts. *c.* 151, § 27, to request the court to frame issues of fact to be tried by a jury. In order to avail himself of the right of a trial by jury, if he had such right, it was necessary for the defendant to make an application to the court under this statute. Having this election of methods of trial, the defendant, in December, 1883, had the cause set down for a hearing before a single justice. This, under the rule, was no doubt done on a day previous to the day fixed for the hearing. It was necessary to notify the other side that the cause had been thus set down. Parties are to have time to make needful preparations for trial. This course of action was inconsistent with an intention or expectation on the part of the defendant to have a jury trial. It was a formal and significant act, showing an election by him to have the cause tried before a single justice, without a jury. It was not

done through any misleading, or surprise, or misapprehension, or inadvertence. Indeed, the testimony of the clerk of the court shows that the cause was set down for a hearing twice in December, 1883, and again on February 20, 1884; though he does not testify, and the record does not show, that at either of these times it was so set down by the defendant. The finding of the justice is, that in December, 1883, the defendant had the cause set down for a hearing upon the merits before a single justice of this court. We cannot regard this otherwise than as showing an intention on the part of the defendant at that time not to ask for a trial by jury. He himself elected the other method.

It is then to be considered whether this state of things was changed by anything that occurred afterwards. The judge finds, that the defendant insisted upon a hearing, unless some agreement could be made whereby the attachment of real property made under the writ should be postponed to certain conveyances which he wished to make; that an agreement was ultimately made to this effect, and the defendant did not then insist upon the hearing. In other words, the hearing was then postponed by agreement. But such postponement, under such agreement, did not of itself vary the legal effect of the defendant's act in setting the cause down for a hearing. Cases are always liable to be postponed by agreement, or by order of the justice for good cause shown. If the defendant wished to restore himself to the right of having a trial by jury, which he had waived, he should have made that a part of the stipulation. He did not do so. There is nothing to show that he then understood or wished that the case should be tried before a jury, or that he should be reinstated in his right to such trial.

Nor did the subsequent amendment to the bill have that effect. This was filed and allowed on February 21, 1884. No new matter of substance is charged in the amended bill against the sole defendant now before us. The original bill alleged that the defendant, conspiring and arranging with Robinson to cheat and defraud the plaintiffs, agreed with Robinson that they should call the price of the mine $200,000, and that the statements made to the plaintiffs by Robinson were made in pursuance of such arrangement and conspiracy; that the price was

much less, and that the defendant paid and Robinson received much less. The answer to the bill is very general; but it denies that the defendant made any false statements or representations to the plaintiffs, or that he conspired and arranged with Robinson to cheat and defraud the plaintiffs. The main object of the amendment was to make Robinson a party to the suit, and to charge him also with conspiracy and fraud. He never was served with process, never appeared, and is not before us. The defendant filed a new answer to the amended bill, but not till after he had filed a separate request for a jury trial. The new answer is in the same words as the original answer, except in referring to the bill as "the amended bill," and in adding a demand for a trial by jury. It is not contended by the defendant that his situation was changed by the amendment in any respect, except by its making Robinson a party. He says that, before the amendment, Robinson's testimony could be obtained only by deposition, or by his voluntary appearance as a witness; whereas, if Robinson should voluntarily submit himself to the jurisdiction of the court, — an act over which the defendant Wooldredge had no control, — his testimony could be readily taken by interrogatories; and, with this contingency in view, the defendant might well say that he desired such testimony to be presented to a jury.

The answer to this is twofold. In the first place, Robinson never in fact appeared as a party, and so the position of the defendant Wooldredge remained unchanged. Besides, if Robinson had appeared, answers made by him to interrogatories propounded under the statute would not be competent to affect Wooldredge, the latter having no opportunity to cross-examine him. The decision in *Stetson* v. *Wolcott*, 15 Gray, 545, only held that interrogatories may be addressed to one of several defendants, without including all the defendants, in an action of contract; and that his answers thereto are admissible in evidence for the plaintiff. The objection there raised was, that the questions should have been proposed to all the defendants, and their joint answers taken. Statements made by a conspirator long after the completion of the fraudulent enterprise, which are merely narratives of past occurrences, are not competent to affect others. 1 Greenl. Ev. § 111. And the fact that such

statements might be obtained by means of interrogatories under the practice act would not change the general rule of law.

The question remains, whether, as a matter of judicial discretion, the judge erred in refusing to frame issues for a jury. An important element in the determination of this is the time when the application to the court was first made. This was on September 23, 1884, twenty-nine months after the filing of the bill, almost twelve months after the parties were at issue, and more than nine months after the defendant had set down the cause for a hearing before a single justice. No time has been fixed by any rule or general order of court within which a party must request the court to frame issues for a jury in an equity cause. But the recent policy of the legislation in this Commonwealth has been, that cases at law as well as in equity should be tried before the court without a jury, unless an early demand for a trial by jury is made. By the St. of 1874, c. 248, a party desiring a trial by jury in a civil action in this court or in the Superior Court must file a notice to that effect within such time after the parties are at issue as the court may by general or special orders direct. By the St. of 1875, c. 212, such notice might be filed before the parties were at issue, as well as after. Such is the law now. Pub. Sts. c. 167, § 69. Ten days after the filing of the answer or plea, in this court, and after the parties are and are required to be at issue, in the Superior Court, is the latest time allowed by the rules for the filing of such notice, unless there is a special order extending the time. See Rule 8 of this court, and Rule 16 of the Superior Court. After the defendant's long delay, in the present case, and after his own act of setting the case down for a hearing before a single justice, we cannot say that, as matter of judicial discretion, issues for a jury ought to have been framed.

We have examined all the cases cited for the defendant, and find none which in our opinion should lead us to a different result. The decisions in New York rested upon a particular provision of the Constitution of that State, prescribing how the right of trial by jury may be waived; those in Louisiana, upon a particular provision in the code of that State; and that in Tennessee, upon an express statute. Decisions upon such points, made in jurisdictions where the systems and methods of procedure may be different from our own, cannot be of controlling weight with us.

The defendant took various exceptions to the admission of evidence at the hearing.

In the first place, he insists that the court erred in admitting evidence of declarations of Robinson before there had been evidence to establish a conspiracy. These declarations were in furtherance of the object of the alleged conspiracy. The justice before whom the trial was had stated that there was some evidence of a conspiracy already, and an offer to produce further evidence; and that it was a mere question of the order of proof. In this there was no error. *Burke* v. *Miller*, 7 Cush. 547. 1 Greenl. Ev. § 111.

The defendant then objects that the court went too far in allowing Dole, on his reëxamination as a witness for the plaintiffs, to testify to what was said in a certain interview between himself and Sinclair (two of the plaintiffs) and Robinson, at the Astor House in New York. The situation was as follows: Robinson gave two depositions to be used in the case. The first was given to the defendant; the second, to the plaintiffs. In the first, he testified that he received $195,000 for the mine; in the second, that he received $100,000. The interview in question was after the first deposition, and before the second had been given. On his cross-examination by the defendant, Dole was asked if he had an interview with Robinson, when and where and how long it was, if they met by appointment, who were present, if he brought a deposition home from New York, if he knew who went out to Palmyra to take the last deposition of Robinson, if he employed any one to go there, or if he knew who did. The cross-examination then proceeded as follows:

*Q.* You were present at another interview?

*A.* A few days afterwards.

*Q.* Where you and Robinson were present, and Sinclair?

*A.* Yes, sir.

*Q.* At which time Robinson told you and Sinclair that he had given his deposition?

*A.* Yes, sir.

*Q.* State all he said about it on that point.

*A.* I asked him if he was willing to come to Boston and testify in this case, and state the facts, or if he was willing to give a deposition if we wanted it. He said, "I have already

given an affidavit," was the way he expressed it, "and it has been sent to my counsel in Boston, or has been filed in court there." I said, "I don't think that is so; I have never heard of any deposition, I have never seen any, and I don't think it can be possible that your deposition has been filed in court in Boston up to this time." He said it certainly had; and I insisted that it certainly had not, to my knowledge.

*Q.* And Mr. Sinclair was there?

*A.* Yes, sir.

*Q.* And heard that?

*A.* I think he heard it. It was said in his presence and mine.

*Q.* What did Sinclair say?

*A.* He said, as I did, that the deposition had not been filed; at least, he had n't access to it; and I think he told Mr. Robinson that his counsel was not obliged to file it, and probably never would.

This fairly opened all that was said in that interview with Robinson on the subject of the deposition he had given, or which he was asked to give; whether Robinson said he would testify for the plaintiffs or not; what testimony he said he would or could give for the plaintiffs; and what requests he said had been made to him not to testify further, or not to come to Massachusetts. These in general were the subjects of the reëxamination; they were not matters new in themselves, or unconnected with the statements elicited on cross-examination, or remote and distinct from that which was the subject of inquiry and investigation on the part of the defendant in cross-examination, but they have a natural and close connection with it. *Commonwealth* v. *Keyes*, 11 Gray, 323. *Straw* v. *Greene*, 14 Allen, 206. *Prince* v. *Samo*, 7 A. & E. 627. 1 Greenl. Ev. § 467.

The defendant's objection that the witness Chester should not have been allowed, on his reëxamination, to testify to the conversation in an interview between himself and Robinson and the plaintiff Sinclair at the Windsor Hotel in New York, rests on the same grounds as that which we have just considered. Sinclair had already testified to the whole conversation. Chester, on his cross-examination by the defendant, was asked as to certain portions of this conversation, including various things said to Robinson by himself and by Sinclair. All the matters to which he

was allowed to testify in his re-direct examination were admitted as portions of the same conversation, and not upon remote or distinct subjects.

The defendant objected to the admission of Robinson's second deposition, on the ground that several important and material interrogatories were omitted by mistake of the commissioner, and were not put to the witness at all. It appears that the plaintiffs filed a list of interrogatories to Robinson, to be annexed to the commission ; that the defendant objected to each and every one, both for form and substance, and also waived the cross-examination ; that the plaintiffs then filed certain additional interrogatories ; that the defendant objected to each and every one of these, both for form and substance ; and that no cross-interrogatories were put. In taking the deposition, no answers were given to any of the additional interrogatories. Under these circumstances, the defendant, having thus specially objected to all of these interrogatories, cannot now be heard to object that they were not answered.

The defendant further contends that the whole scheme of the enterprise, as alleged in the bill, was a fraud upon the public, illegal, and against public policy, and that the plaintiffs are entitled to no relief in equity, even if they were defrauded in such an undertaking. We do not, however, find any averments in the bill showing that any fraud upon the public was contemplated ; nor do we see any occasion to set aside the finding that there was not proof of any illegal purpose in the purchase, such as would prevent the plaintiffs from recovering from the defendant the money obtained from them by his fraud.

The defendant objects that, in respect to one quarter part of the mine, which it was originally contemplated that Robinson should retain, but which was finally included in the purchase from him, and for which the plaintiffs paid $48,750 to the defendant, the relation between himself and the plaintiffs was that of vendor and vendee, and that false representations made by a vendor as to the price which he paid for property do not constitute such a fraud as a court of equity will relieve against. But, on the evidence, we do not think this relation existed between the parties. On the other hand, the evidence is satisfactory to show that he assumed to act for the plaintiffs in the

matter, and treated the supposed purchase and payment by him as having been made for them, and gave them the option so to consider it until their return to Boston. The whole dealing between the parties was on this basis; and, when the plaintiffs finally paid the money to the defendant, it was as an adoption of his supposed act as an act of agency for them, and not as a purchase from a vendor.

The defendant finally contends that the evidence did not warrant the findings of the justice in relation to the alleged conspiracy between the defendant and Robinson, and to the amount of money paid for the mine. But an examination of the evidence shows that the findings were well supported.

*Decree for the plaintiffs affirmed.*